UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-CR-80057-ROSENBERG/HOPKINS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JANIO VICO &
JHARILDAN VICO, a/k/a "Harold Vico"

    Defendants.
_____/

## MEMORANDUM OPINION

On Monday, January 4, 2016, this Court conducted a forfeiture hearing in accordance with Rule 32.2(b)(2)(B), Federal Rules of Criminal Procedure.  The purpose of the hearing was to determine whether two parcels of real estate are subject to forfeiture pursuant to the applicable statutes, and to determine whether personal money judgments should be entered against each of the defendants, Janio Vico and Jharildan Vico. The Court has reviewed the pleadings, heard and reviewed the trial testimony, heard the testimony of the witnesses presented at the forfeiture hearing, made determinations as to the credibility of the witnesses presented, considered the evidence introduced at both the trial and the forfeiture hearing, and heard argument of counsel. For the reasons articulated below, the Court concludes that the government has established by a preponderance of the evidence the requisite nexus between the two parcels of real estate, 669 Pacific Grove Drive, Unit #3, West Palm Beach, Florida  33401, and 610 Cresta Circle, West Palm Beach, Florida 33413 and the offenses of conviction.  Furthermore, the Court has

determined that personal money judgments will be entered as to each defendant as more fully detailed below.

## FINDINGS OF FACT

1.  On October 13, 2015, defendant Jharildan Vico was found guilty by a jury as to Counts 1 through 16 of the Superseding Indictment.  Docket Entry 105.  Count 1 charged conspiracy to commit fraud by mail, in violation of Title 18, United States Code, Section 1349.  Counts 2 through 13 charged fraud by mail in violation of Title 18, United States Code, Section 1341.  Count 14 charged conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).  Counts 15 and 16 charged money laundering, in violation of Title 18, United States Code, Section 1957.

2.  On October 13, 2015, defendant Janio Vico was found guilty by a jury as to Counts 1 through 16 of the Superseding Indictment.  Docket Entry 108.  Count 1 charged conspiracy to commit fraud by mail, in violation of Title 18, United States Code, Section 1349.  Counts 2 through 13 charged fraud by mail in violation of Title 18, United States Code, Section 1341.  Count 14 charged conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).  Counts 15 and 16 charged money laundering, in violation of Title 18, United States Code, Section 1957.

3.  The Superseding Indictment included forfeiture allegations wherein the government is seeking the forfeiture of two parcels of real estate located at 669 Pacific Grove Drive, Unite #3, West Palm Beach, Florida 33401, and 610 Cresta Circle, West Palm Beach, Florida 33413.  These forfeiture allegations are based upon the allegations contained within counts 1 through 13 as proceeds of mail fraud and counts 14 through 16 as proceeds of money laundering.

4.      The government is also seeking money judgments as to defendants Janio Vico and Jharildan Vico.  As to counts 1 through 13, the government is seeking a money judgment in the amount of $1.617 million in United States currency.  As to counts 14 through 16, the government is seeking a money judgment in the amount of $397,208.45.

5.      On October 13, 2015, the defendants agreed to a hearing before the Court as to all of the forfeiture issues.

6.      The Court will first review the testimony and evidence at the trial and forfeiture hearing.

7.      Captain Steven Smith, who is employed with the State of Florida, Division of Insurance Fraud, testified at trial.  Part of his testimony included a discussion of clinics using straw owners, such as a doctor, chiropractor, or a massage therapist who is paid to front as the owner of a clinic, to perpetrate the fraud.  The person's name is put on corporate documents, bank documents, and possibly other documents.  As part of an investigation, his agency will try to determine the true owner by following the money and where it ends up.  In addition, a straw owner in most cases is a paid employee and is not involved in any decision making process involving the clinic.  Any claims made to a clinic that has a straw owner are noncompensable. He further testified that failure to have the required license is a felony.[1]  Testimony Steven Smith, p. 14, line 24 – p. 17, line 19.

8.      V & V Rehabilitation Center Inc. was incorporated in the State of Florida. Jennifer Adams was listed as the officer, director and incorporator in the initial filing of the corporate documents with the Florida Secretary of State, Division of Corporations.  Adams remained listed in these positions until August 18, 2011, upon the filing of an amendment to the corporate documents signed by Janio Vico.  Exhibit (Ex.)  200.

---

[1] Fla. Stat. § 400.9935(4); *see also* Fla. Stat. § 817.234(1)(a)(4).

9. Jennifer Adams agreed to be the straw owner of V & V Rehabilitation Center. She sold her chiropractic licensed so that it could be used to establish the business. Jennifer Adams did not invest any capital in V & V Rehabilitation Center Inc. to purchase equipment or lease a location, did not hire and fire employees, did not control the books and records of the company, did not sign leases for the company, did not hire accountants for the company, did not cause insurance claims to be filed for the company, and did not set policy for the company. Adams testified that she did not own V & V Rehabilitation Center. Trial testimony Jennifer Adams p. 30, 31-36, 44-50, 53-56, 58, and 128.

10. Jennifer Adams did not own V & V Rehabilitation Center, Inc. Janio Vico and Jharildan Vico hired and fired all personnel, oversaw insurance claims filings including hiring attorneys to demand payment on submitted unpaid claims, leased and paid rent for the V & V Rehabilitation Center Inc. premises, set policies for the operation of V & V, controlled the books and records of V & V, purchased new and replacement equipment and supplies, paid the personnel employed at V & V including Jennifer Adams, paid recruiters for bringing clients to V & V, obtained motor vehicles and controlled the bank accounts and distribution of profits. Trial testimony Jennifer Adams p, 34-36, 47, 58; Ex. 100, 100.1. Jennifer Adams admitted to turning in forms for billing, at the insistence of Janio Vico, indicating she had seen a client for examination when she had not. Trial testimony Jennifer Adams p. 95-98.

11. William Diaz and Yaniesy Pena admitted they turned in forms for billing purposes that had been pre-signed by clients of V & V Rehabilitation Center Inc. even though the client had not appeared for the billed therapy session. Diaz and Pena prepared these false documents at the insistence and direction of Janio Vico and Jharildan Vico and did so on numerous occasions.

12. Nestor Mascarell ("Mascarell"), a forensic accountant for the Federal Bureau of Investigation, testified as to his examination and analysis of the bank records for V & V Rehabilitation, Ultimate Investments Management, Corp., Imperial Investments Management, Corp., and the personal accounts for both defendants. As part of that examination, he prepared excel sheets and summaries of the bank documents and records. Testimony of Nestor Mascarell p. 6, 10-11, 22-25; Ex. 100, 101, 102, 103, 104, 600, 600.1, 600.2, 601, 601.1, 602 and 602.1. Bank account records and the excel sheet pertaining to the deposits into V&V's JP Morgan Chase bank account ending in 8574 covered the period December 2009, the opening of the account, through October 4, 2011, and included information as to the insurance checks deposited, the claim numbers associated with the checks, and the amounts. A separate excel sheet was prepared as to the withdrawals. Based upon his review, during that time frame, $1,879.020.67 was deposited from insurance companies. Testimony of Nestor Mascarell, p. 25, l. 15; Ex. 600, 600.1.

13. At the forfeiture hearing, the government submitted a chart prepared by Nestor Mascarell updating the original Exhibit 600.1. Exhibit 600.1 was updated by Exhibit 600.4. Exhibit 600.4 included a review and analysis of an additional month's bank deposits. Based upon the additional deposits, the total amount of deposits from insurance company payments into the V&V account from December 7, 2009, through November 4, 2011, was $1,947,966.18. Forfeiture hearing transcript p. 33-37.

14. Nestor Mascarell testified at trial that money used to purchase the two properties 669 Pacific Grove Drive, Unit #3, West Palm Beach, Florida 33401, and 610 Cresta Circle, West Palm Beach, Florida 3341, originated from moneys sent to V&V by the insurers and deposited into the V&V account. The monies were thereafter transferred from the V&V bank account to

5

the companies Imperial Investments Management Corp., and Ultimate Investments Management, Corp. Jharildan Vico is listed as the officers, director, and registered agent for Imperial. Janio Vico is listed as the officers, director, and registered agent for Ultimate. Testimony of Nestor Mascarell p. 31, 32, 39, 43, 45-49, 62-63; Ex.15, 15.1, 16, 16.1, 16.2, 602.2 and 601.2.

15.     More specifically, from July 27, 2010 through October 15, 2010, $160,675.00 was transferred from the V&V account to the Imperial account. During the same time frame, $50,000.00 was also deposited into the Imperial account from the Ultimate account. These two deposits represented 51% and 16% of the deposits into the account respectively. Trial testimony, Nestor Mascarell, p. 45-47; Ex. 601.1.

16.     The United States established at trial that on October 15, 2010, $246,245.88 was wire transferred from the Imperial account to Kahane & Associates for the purchase of 610 Cresta Circle. Trial testimony, Nestor Mascarell, p. 48-49; Ex. 15. There was also a $5,000.00 check to Highlight Realty for the purchase. Trial testimony, Nestor Mascarell, p. 57; Ex. 14.1. Mascarell further testified that most of the money used for this purchase was derived from the V&V account. Trial testimony, Nestor Mascarell, p. 49, l.7-10. The Cresta Circle property is titled in the name of Jharildan Vico. Ex. 15.2.

17.     As to the Ultimate account ending in 3321, from July 16, 2010 through December 10, 2010, $349,882.00 was transferred from the V&V account to the Ultimate account. This deposit represented 73% of the deposits into the account during this time frame. Trial testimony, Nestor Mascarell, p. 45-47; Ex. 602.1.

18.     There was a deposit check dated November 30, 2010, in the amount of $2,000.00 payable to Barclays International Realty, for the purchase of the property at 669 Pacific Grove. Trial testimony, Nestor Mascarell, p. 57, Ex. 14.2. Mascarell further testified that most of the

money used for this purchase was derived from the V&V account. Trial testimony, Nestor Mascarell, p. 62-63, l.7-10. On December 10, 2010, a cashier's check in the amount of $138,962.57, was obtained using the funds from the Ultimate management account payable to Galvan Messick LLP for the purchase of the Pacific Grove property. Trial testimony Nestor Macarell, p. 62-63; Ex. 16, 16.1, 16.2, 602.1. The Pacific Grove property is in the name of Janio Vico.

19. Fred Burkhardt, an employee of the National Insurance Crime Bureau, testified at the forfeiture hearing. Mr. Burkhardt stated that he gathered information from 22 insurance companies about the amount of claims actually paid including any expenses. Mr. Burkhardt stated he prepared a chart that showed the responses from 15 insurance companies who reported the total amount paid by claims made to the insurance companies was $1,617,738.78 and there were additional expenses to the insurance companies of $303,893.43. The chart covered the period December 4, 2009 to October 5, 2011. Forfeiture hearing transcript, p. 7, 17; Ex. 603.

## **CONCLUSIONS OF LAW**

To the extent that any of the findings of fact may be deemed conclusions of law, they are incorporated herein as conclusions of law.

1. Rule 32.2 of the Federal Rules of Criminal Procedure sets forth the procedures for obtaining forfeiture in a criminal case. Rule 32.2(b)(1)(A) provides as follows:

> As soon as practical after a verdict or a finding of guilty ... on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

7

When the government is seeking forfeiture of specific property, the court must make a determination as to whether there is a nexus between the specific property and the offense of conviction.  *United States v. Davenport*, 668 F.3d 1316, 1320 (11th Cir. 2012).  When the government is seeking a money judgment, the court determines the amount of money that the defendant must pay.  Rule 32.2(b)(1)(A), Federal Rules of Criminal Procedure.

2.	The government has the burden of establishing the nexus by a preponderance of the evidence.  *United States v. Cabeza*, 258 F.3d 1256, 1257 (11th Cir. 2001); *United States v. Dicter*, 198 F.3d 1284 (11th Cir. 1999).

3.	Criminal forfeiture is part of the sentence.  It is not a substantive element of the offense.  *Libretti v. United States*, 516 U.S. 29, 49 (1995).  Since forfeiture is part of sentencing, reliable hearsay may be used to satisfy the government's burden of proof by a preponderance of the evidence.  *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007); *United States v. Brown*, 2013 WL 2473034, *2 (D. Md. 2013); *United States v. Gaskin*, 2002 WL 459005, *9 (W.D.N.Y. 2002); *United States v. Overstreet*, 2012 WL 5969643, *17 (D. Idaho 2012); *United States v. Stathakis*, 2008 WL 413782, *14 n.2 (E.D.N.Y. 20008).

4.	The Court's determination of forfeiture may be based on evidence already in the record and on any additional evidence or information submitted by the parties.  Rule 32.2(b)(1)(B).

5.	The nexus as to the properties based on the convictions for counts 1-13 is whether the property constitutes or is derived from any proceeds traceable to the violations for which the defendants have been convicted.  18 U.S.C. § 981(a)(1)(C).

6.	In cases where illegal services, unlawful activities, and health care fraud schemes are involved, the term "proceeds" is defined as "property of any kind obtained directly or

indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A).

7. The nexus as to the properties based on the convictions for counts 14, 15, and 16 is whether the property was involved in the offenses for which the defendants have been convicted, or is traceable to such property. Title 18 U.S.C. § 982(a)(1).

8. The defendants argued at the forfeiture hearing that the government's theory of criminal prosecution was based solely on staged accidents which involved a small amount of false claims that were submitted to the insurance companies. Therefore, any forfeiture was limited to only those proceeds relating to the individual transaction in the substantive mail fraud counts, counts 2-13. This argument ignores the purpose and scope of the scheme to defraud in this case and is not supported by the structure of the indictment, the evidence and testimony presented at trial and at the forfeiture hearing.

9. The Superseding Indictment charged in count 1 a conspiracy to commit mail fraud. The general allegations, paragraphs 1-25 included the requirements of Florida's No-Fault law and licensing requirements for operating a clinic and providing services. Count 1 re-alleged and incorporated these paragraphs in describing the scheme to defraud. The manner and means of the scheme included the defendants' use of a straw owner to set up the clinic. This was an integral part of the overall scheme to defraud the automobile insurers. D.E. 56, Superseding Indictment, paragraph 29.a. The fraud began with misrepresentations in the corporate and medical license paperwork as to Dr. Adams' alleged ownership of the clinic, and continued on to include, but was not limited to, recruiting individuals involved in real accidents or staged

accidents, the falsification of paperwork concerning injuries or treatment, signing forms in blank, and paying "accident victims" for their cooperation.

10. Similarly, counts 2-13 re-alleged and incorporated paragraphs 1-25 thus alleging the entire scheme, not just the particular execution identified in the substantive count.

11. Furthermore, it is not necessary to charge as a substantive offense every aspect of a conspiracy in order to forfeit the proceeds of an entire conspiracy. *United States v. Hasson,* 333 F.3d 1264, 1279 (11th Cir. 2006) (Defendant convicted of conspiracy to commit wire fraud, wire fraud, conspiracy to launder money, and conspiracy to obstruct justice. Jury free to consider evidence of mail and wire frauds adduced by the government in support of money laundering count, though not charged as separate substantive counts of mail or wire fraud); *United States v. Capoccia*, 402 F. A'ppx 639, 641 (2nd. Cir. 2010).

12. The testimony of Jennifer Adams showed that Jennifer Adams was a straw owner of V & V Rehabilitation Center, Inc. But for this fraudulent set up of the clinic, the defendants would not have been able to bill insurance companies for claims, whether the accidents were staged or real, or receive compensation for any claims. Fla. Stat. § 400.9935(3).

13. The Eleventh Circuit case, *United States v. Hoffman-Vaile*, 568 F.3d 1335 (11th Cir. 2009), is instructive. In *Hoffman,* the defendant, a dermatologist, was convicted of health care fraud, filing false claims, and obstruction of justice. The defendant regularly billed Medicare. Audits showed an abnormally high usage of a particular billing code. Ultimately, the doctor was indicted for fraudulently billing Medicare and convicted. At sentencing, a forfeiture money judgment was entered against her as well as an order of restitution. The defendant challenged both the restitution and forfeiture order arguing that she could not be held responsible for any payments made by any private insurers or the patients, only the proceeds paid by

Medicare. The Eleventh Circuit held that the money she had received from the private insurance companies and the patients were "gross proceeds traceable to the commission of" her fraud because, but for her Medicare fraud, she would not have been entitled to collect these sums from the companies and patients." *Hoffman*, 568 F.3d at 1344.

14. Similarly, the revenue stream that the defendants in this case received from the insurance companies would not have existed or been generated but for the fraudulent set-up of V & V Rehabilitation Center. *United States v. Cekosky*, 171 F. App'x 785, 788 (11th Cir. 2006) (Court affirmed forfeiture of interest income earned from bank accounts as criminally derived proceeds because Defendant was only able to open the bank accounts by using stolen identities.); *United States v. Warshak*, 631 F.3d 266, 332-33 (6th Cir. 2010) (Court affirmed money judgment against owner of business because money generated through sales was outgrowth of company's fraudulent beginnings and its entire operation was permeated with fraud); *United States v. Coffman*, 859 F. Supp. 2d 871, 875 (E.D. Ky. 2012) (proceeds of a fraud is defined as "property that a person would not have but for the criminal offense."). V&V, from its very inception, was the vehicle by which the conspiracy accomplished its goals. This was not a case, for example, where an otherwise legitimate business engaged in a subset of fraudulent transactions. Nor is this a case where a business, originally legitimate, lapsed into criminal activities. Instead, *every* transaction at V&V—from its inception—was part of the defendants' conspiracy to commit fraud and was in furtherance of that conspiracy.[2] To the extent any of the bills submitted to insurance companies by V&V were for services actually performed and were not derived from staged accidents, those transactions still served a core goal of the conspiracy— to commit fraud without attracting any scrutiny. Importantly, however, substantial evidence was admitted that showed V&V did not collect (or barely collected) co-pay payments from patients.

---

[2] The Court's analysis is necessarily confined to the dates at issue in this case.

This is evidence that reveals the true purpose of the formation of V&V in the conspiracy. The purpose of V&V was not to provide services to customers. The purpose of V&V was to submit fraudulent bills to insurance companies in such a way as to avoid detection. Regardless of whatever miniscule percentage of V&V's gross income was for services actually performed outside of the context of a staged accident, the evidence supporting the conspiracy in this case showed that V&V, from the very start, was created for the purpose of fraudulent billing and V&V was used for that precise purpose by the defendants.

15. For purposes of forfeiture as to Counts 1-13, any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1341, as charged in counts 2-13, or a conspiracy to commit a violation of 18 U.S.C. § 1341 (18 U.S.C § 1349), as charged in count 1, is subject to forfeiture. 18 U.S.C. § 981(a)(1)(C). In this case, the government is seeking forfeiture of 2 parcels of real estate based upon the convictions of the defendants for counts 1-13.

16. The Court finds that based upon the findings of fact the government has established the requisite nexus between the crimes of conviction in counts 1-13 and the two properties acquired by the defendants, 610 Cresta Circle and 669 Pacific Grove Drive. Both of these properties were purchased with criminally derived proceeds from the mail fraud scheme. Therefore, the two properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 based upon the conspiracy and mail fraud conviction in counts 1-13.

17. The government is also seeking a money judgment in the amount of $1,617,738.78 as to each defendant based upon the convictions in counts 1-13. Money judgments in the amount of the proceeds obtained from the overall scheme are warranted. *United States v. Padron*, 527 F.3d 1156 (11th Cir. 2008). At trial the government presented abundant evidence and testimony

of the overall scheme, the straw ownership role of witness Jennifer Adams, the fraudulent set up of the clinic by the defendants, and the methodology used by the employees to falsify records in order to maximize claims up to the $10,000.00 PIP limit regardless of merit.  Therefore, all of the insurance moneys paid to V & V Rehabilitation constitute proceeds traceable to the commission of the defendants' fraud.  *United States v. Venturella*, 585 F.3d 1013 (7th Cir. 2009); *United States v. Capoccia*, 402 F. A'ppx 639, 640 (2d Cir. 2010).

18.     The government presented three sets of figures concerning the proceeds that V&V received from the insurance companies.  The first figure was based on the analysis of Nestor Mascarell of the actual bank account and the deposits received from the insurance companies concerning claims submitted by V&V.  This analysis covered the time period December 7, 2009 through October 4, 2011.  Gov. Ex. 600, 600.1.  The second figure was based on the testimony of Fred Burkhardt, National Insurance Crime Bureau, at the forfeiture hearing who obtained figures from certain insurance agencies concerning the amount paid to V&V for claims and other costs/expenses covering the period December 4, 2009 to October 5, 2011.  Ex. 603.  The third figure was based on the testimony of Nestor Mascarell at the evidentiary hearing who updated his original analysis to cover the time frame December 7, 2007 through November 4, 2011.  The Court notes that there is some variance in the figures as well as the time frames covered.

19.     Based upon the Court's review of the testimony and the records, the Court finds that a money judgment consistent with Mascarell's analysis of the bank records showing the payment of claims to V&V through October 4, 2011, most closely reflects the amount of proceeds obtained as a result of the fraud.  *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011) (Law does not demand mathematical exactitude in calculating proceeds.  Rather, district courts may use general points of reference as a starting point for a forfeiture calculation and

make reasonable extrapolation supported by a preponderance of the evidence.); *United States v. Prather*, 456 F. A'ppx 622, 626 (8th Cir. 2012).

20. Therefore, as to counts 1-13, a money judgment in the amount of $1,870,000.00 (rounded off) will be entered against defendant Janio Vico and a money judgment in the amount of $1,870,000.00 will be entered against defendant Jharildan Vico.

21. The defendants are also jointly and severally liable for the money judgments. *United States v. Browne*, 505 F.3d 1229, 1279 (11th Cir. 2007).

22. The jury also found both defendants guilty of counts 14-16, conspiracy to commit money laundering, money laundering for the wire transfer of $246,245.88 for the purchase of the Cresta Circle property, and money laundering for the cashier's check in the amount of $138,962.57 for the purchase of the Pacific Grove property. The jury instructions for these charges made it clear that in order to find the defendants guilty of counts 14-16, the transactions had to involve property or funds that were in fact proceeds of mail fraud. The jury's verdicts of guilty are consistent with the evidence and testimony at trial and the government's position that all of the money from the insurance companies was the result of the overarching scheme to defraud the insurance companies. Jury verdicts, Docket Entry 102.

23. Assuming some legitimate funds may have been commingled with the funds used in the money laundering transactions, those funds are also forfeitable as the corpus of the money-laundering offense. *United States v. Huber*, 404 F.3d 1047, 1056-58 (8th Cir. 2005); *United State v. Overstreet*, 2012 WL 5969643, *19 (D. Idaho 2012).

24. The government is also seeking a money judgment in the amount that was laundered, that is $397,208.45. Based on the evidence and the records of the real estate transactions, this number needs to be corrected to $385,208.45 (246,245.88 + 138,962.57). This

court will impose a money judgment in the amount of $385,208.45 as to each defendant for which they are jointly and severally liable. *United States v. Puche*, 350 F.3d 1137 (11th Cir. 2003). This amount represents the laundered proceeds that were involved in the two real estate transactions.

25.   Counsel for defendant Janio Vico stated that money judgment is punitive in nature and that the Eight Amendment applied. Forfeiture hearing transcript, p. 31, l.12-18. That matter is not ripe for consideration. In the context of criminal cases, an excessive fines challenge is appropriately raised at sentencing after the Court enters a preliminary order of forfeiture. *United States v. Tedder*, 2003 WL 23204849, at 6 (W.D. Wis. July 28, 2003) (challenge to criminal forfeiture on Eighth Amendment grounds premature until the Court enters a preliminary order of forfeiture).

## CONCLUSION

Based on all of the above, the Court finds that the government has met its burden by a preponderance of the evidence as to the forfeiture of the two parcels of real estate and as to the entry of money judgments as to both defendants. The Court will enter a separate preliminary order of forfeiture consistent with this Court's findings and conclusions.

**D**ONE AND ORDERED in Chambers at Fort Pierce, Florida, this 20th day of January, 2016.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

cc:   Ellen Cohen, AUSA
      Antonia Barnes, AUSA
      Humberto Dominguez, Esq.
      Samuel Montesino, Esq.
      John Bergendahl, Esq.

<u>SERVICE LIST</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-80557-CR-ROSENBERG/HOPKINS(s)

Antonia J. Barnes
Assistant U.S. Attorney
Antonia.Barnes@usdoj.gov
U.S. Attorneys Office
500 S. Australian Ave., Ste. 400
West Palm Beach, FL 33401
Tel: (561) 820-8711
Fax: (561) 655-9785
Attorney for Plaintiff United States
[Service via CM/ECF]

Ellen Cohen
Assistant U.S. Attorney
ellen.cohen@usdoj.gov
United States Attorneys Office
500 S. Australian Avenue, Ste. 400
West Palm Beach, FL 33401
Telephone: (561) 209-1046
Facsimile: (561) 659-4526
Attorney for Plaintiff United States
[Service via CM/ECF]

Humberto Dominguez, Esq.
bert@hdominguezlaw.com
800 Brickell Avenue, Ste. PH-2
Miami, FL  33131
Telephone: (305) 373-6400
Facsimile: (305) 373-0396
Attorney for Defendant Janio Vico
[Service via CM/ECF]

Samuel Montesino, Esq.
samuelmontesino@yahoo.com
2161 Palm Beach Lakes Blvd, Ste. 307
West Palm Beach, FL  33409
Telephone: (561) 721-3322
Facsimile: (561) 721-3366
Attorney for Defendant Jharildan Vico
[Service via CM/ECF]

John Bergendahl, Esq.
lojeb1100@gmail.com
Ingraham Building
25 S.E. 2nd Ave., Ste. 1100
Miami, FL  33131
Tel:  (305) 536-2168
Fax:  (305) 536-2170
Attorney for Defendant Jharildan Vico
[Service via CM/ECF]